## WILLIAMS *v.* JOHNSTON.

### Opinion delivered July 22, 1907.

GIFT—WHEN IRREVOCABLE.—When a gift *inter vivos* has been perfected, that is, when nothing more is to be done to vest the title in the donee, such gift can no more be revoked by the donor than a sale or any other executed contract.

Appeal from Franklin Chancery Court; *J. V. Bourland,* Chancellor; reversed.

#### STATEMENT BY THE COURT.

This is a controversy over a wagon and team of horses and $965 delivered by Johnston to Williams. Johnston recovered judgment, and Williams appealed.

The substance of Williams's evidence is:

Since 1899 he has engaged in religious work, believing that he is the steward of the Lord, and has established various homes or colonies for those who accept his faith. He has established colonies in Colorado, Oregon and other States. In 1899 he purchased a farm near Ozark, in Franklin County, Arkansas, and established a home for his faith thereon, and conducted a fruit and vegetable farm. It seems that his homes are a series of fruit farms. He only permitted those accepting his faith to enter them. Persons entering his colony or home must not only accept his faith, but must subject themselves solely to his direction and authority in matters spiritual and temporal. They must give up all family ties, and consecrate their property, means and labor to the work. He never accepts any gifts except when made freely and voluntarily. Gifts are not received by him with conditions, and the giving of property does not of itself grant rights in a home. Property is given as a sacrifice and surrender, and accepted as a consecration of the person to the work, and no person can reside with him unless he makes full consecration; and, as soon as a person refuses to conform to the regulations, he would cease to be a member. The home privilege is a gift to the person, just as his property is a gift to the steward. There are no bargains and no agreements or conditions touching gifts, and the same with the homes. He reserves the right to determine who shall be inmates of the homes; he usually gives his followers a home when they conform to the regulations; but the giving of the home privilege is not conditioned on receiving any property. Most of the people in the work brought only themselves. He is the absolute owner of the property given, and it is not held in common. Gifts of money and property are used for the living expenses of his people. It would not be possible to receive gifts on condition, nor promise to return them, because, being used for expenses of his people, and so intended, there would be nothing to return after their consumption in the uses intended. It would not be possible to promise a return because, if the person would leave, his claim for a division would "impair all the efficiency, labor and safety of the work;" and, another reason, if the person should die, his heirs would claim division, and throw the entire work in confusion and the members in distress. He owned considerable

property before he went into this work, and his large property interests in the various homes were derived partly from voluntary gifts to further his work and partly from his own resources. Property received from gifts is for the benefit of the people in the work, and he understands the words in the Bible, "in common," to mean benefit, not ownership. He says that, legally, he is the owner of the property given him; spiritually, he is a steward of the Lord, and they consider Him the owner. There is no written constitution or articles of faith in his sect, and it is not an incorporated society.

He said appellee Johnston had been corresponding with him for some years with a view of joining his sect. He wanted to join his work in Colorado, but he advised him to go to Oklahoma, and take a land claim, which he did; and some years thereafter he renewed his request to join in the work. After some correspondence, from which it appears that Williams advised him that it was an advantageous time to sell his Oklahoma land, he came to the home at Ozark. He delivered his wagon and team and $750 to Williams's wife (the prohibition against marriage ties did not extend to the steward of the flock), Williams then being in Oregon. Later he delivered to Williams the balance of the money, in all $965, which was the sum realized from his Oklahoma land. Before he came, he was made to understand fully the rules of the sect, the life to be led was explained, that everything was received as a voluntary gift and sacrifice, and that he was not entitled nor permitted to have the ownership of any property after surrendering it to him. He gave the property in question, fully understanding the effect of the gift, and said that it was to be used as the Lord saw fit. Johnston stayed in the home at Ozark for four and a half years, was supported by him (Williams), and did some farm work, but not much, as most of the work was hired, the inmates as a general thing not being able to do much work. He first left the home voluntarily, and stayed a while in Ozark, and returned and stayed at the home for some time, and then again voluntarily left, and when he attempted to return this time he barred him out, and excluded him from the home, and expelled him from the faith, for the reason that he refused to accept his authority and was causing reproach to the home. He says a great change took place in

him before he left. When he first came, like the others, he was gentle and agreeable to the regulations; but he ceased to be before he left, and the disagreement was on account of his change in his religious belief. He became the defender of those who opposed his works.

W. M. Herring, an assistant to Williams, testified in full corroboration of all Williams's version of the rules of the faith, the giving of Johnston's property freely and understandingly. On cross-examination, these questions and answers were given:

"Q. Is it not a fact that all property is held in common for the mutual benefit of all? A. It is held by Mr. Williams alone. He has sole direction over everything that comes into the work. It belongs to him. It is turned over to him, and in his name, and no one has anything to do with the direction and the government of what is brought into the home. Q. Is it not a fact that Mr. Johnston was to have a home on the farm and support, the same as all other members of this home? A. Of course, that was considered his home as long as he abided by the principles. Q. What compensation are parties to have for property and money surrendered to this work? A. Well, he is to have none. He is supposed to consecrate and give all to the Lord, and, as Mr. Williams is simply a steward, he accepts them as an offering to God. That is all the compensation—only what he gets spiritually."

Mrs. Williams and her two daughters testified to Johnston's delivering the wagon and team and money to Mrs. Williams when he came. The substance of it was that he gave this property freely as air, that he wanted nothing more to do with it, that it was no longer his, and that he was received in the spirit in which he came, and the home opened to him, and he was given all its benefits.

W. H. Groves of Colorado testified to the work by Williams and the manner of receiving property. His testimony sustains in full Mr. Williams. He tells of one Mr. Redding, of Colorado, who is ambitious to supplant Mr. Williams, and is inciting suits, hoping to be made receiver of the property. On cross-examination, he says that he is in unity with Mr. Williams, but free in all respects. He says Mr. Williams does not consider persons in his home servants, but as persons voluntarily seeking his direction in all matters.

Messrs. J. M. Ferguson, Henry Mahler, W. L. Morrow and W. W. McCallay testified substantially to the same effect as Mr. Groves.

The appellee, Ed Johnston, testified in detail as to all matters covered in Williams's testimony, and, excepting in a few matters, there is no serious conflict between them. His account of his reason for giving his property and his idea of the sect is thus explained:

Q. "What induced you to come and put that amount of property and money into the home? A. Because I thought it was the work of the Lord on the earth, and I did it with a feeling of love toward the work. From what I had heard of the work, I understood it to be the continuation of the organization that was started at Jerusalem wherein those that had land and possessions sold them, and brought their price and laid it down at the disciples' feet in common, to be divided up to every man, according to his need. Q. What was your understanding as to the ownership of property put into the work and of the benefits to be derived therefrom? A. I understood, of course, that every one should be provided for without any partiality whatever; that every one in the home should have just as good a right to a say so and also to the privileges of the property in the whole colony. That was my understanding. Q. When you speak of the whole colony, do you mean the property situated in Colorado and other places as well as Ozark? A. Yes, sir, I do; the whole colony."

He tells of a disagreement with Mr. Williams over his protesting against the way the horses he had given the home were being treated, in which Williams denied his right to have any will concerning them, saying they were his individually. His account of his expulsion was as follows: "Q. You may state, Mr. Johnston, what was the cause, if you know, of Mr. Williams turning you out of the home or away from the place out there. A. Yes, I do. On the 19th of November, he put the question right square at me and said, 'Are you willing to take my word as the voice from His altar to you in everything?' I said 'No, sir; I denounce it. I will not take your voice as the voice of God to me.' Then he said, 'You are not my friend.' On the 22d day of November last he wrote me a letter expelling me from the community and mem-

bership forever. Mr. Williams sent a copy of this letter to this man Redding, at Cripple Creek, Colorado. In about eight days I got a letter from Redding telling me I was now a free man. I read the letter before them all. I said that I thought that this was my Father's house; that this was where I put my all. 'Now,' I says, 'here is the place that I am going to stay.' Mr. Williams spoke up and said, 'I rebuke you.' I said, 'Your rebuke doesn't amount to anything. Here is where I am going to stay.' Herring spoke up and shook his head and said, 'You will not, either.' "

He tells of the beginning of the litigation between them, and of the gates to the home being fastened against him. He tells of the work he did on the farm, which shows he must have been quite a useful worker, and that he did not even receive shoes when needed, and that $3.80 was all the money he had received for his own use.

On cross-examination, he says that he had corresponded with W. A. Redding covering a period of five years before he came to Ozark; it was on Bible themes and in reference to the colony of which Mr. Williams is the head. He admits that no one can become a member without surrendering all he has, and he complied with it, and that when he gave it he said he gave it as freely as air. He showed a preference for Mrs. Powell, and refused to quit paying attentions to her when requested.

Mrs. Mary Powell, who had been a member of Mr. Williams's home for twenty-four years, testified in Johnston's behalf. Much of her testimony is a repetition of the history of the sect, its purposes, etc., and Johnston's connection with it, as given by the other witnesses. But her account of Williams's methods differs from the other witnesses. Her testimony on this point is as follows:

"Q. State, Mrs. Powell, what was your understanding of parties as to surrendering or giving of property or money into this home? A. Well, I can answer that question better in reference to my own self. Well, when I came to the home, I was led by the spirit to the home, and it was with the feeling of love to God that I laid all my property down, and it was for Him I felt like in the days of old, when the disciples laid everything down on the altar and had everything in common. I was led into it, and I think it was a year after I went into the home

before my all went out of my hands. We were just led into it, step by step. It came up on the line of discerning of spirits. Q. Explain, please, what was meant by the discerning of spirits. A. Mr. Williams claimed a gift of discerning of spirits, and he gave many of the members in the home the power to tell the works of the spirits, and are all called to tell spirits by the different operations of spirits. Q. This discerning of spirits that you speak of originated with Mr. Williams, did it not? A. Yes, sir. Q. Then this discerning of spirits was what led you to surrender your property to Mr. Williams? A. Yes. None of us wanted to be under spirits, and we did it to get free. What we wanted was to be a free people. Q. Then you were led to believe that, in order to be a free people, you had to surrender this property? A. Yes, sir. Q. Now, what was the understanding as to benefits to be derived by parties surrendering this property? A. Well, we all lived in the home, and all shared the benefits of everything as it was given to the home, and all worked together, you know. Q. Was it understood that you had all things in common for the common good of all? A. Well, I don't know. That was the understanding—that everything was to be owned and controlled alike."

She tells of Johnston's differences with Williams, resulting in his expulsion, substantially as Johnston does. She says that the difference was religious, and that Mr. Johnston had not been in accord with the religious principles of Mr. Williams for some time prior to his expulsion. She left the home because she did not feel in union with Mr. Williams's dealings with Mr. Johnston.

The chancellor gave judgment in favor of Johnston for the $965 and the value of the horses and team; and Williams appealed.

*W. W. Cotton,* for appellant.

1. The property and money were a gift *inter vivos* by the appellee to the appellant, the donor being competent to give, having the right to give, and the donee being competent to receive. The transaction was completed by transfer of possession, is an executed contract and irrevocable. 1 Parsons, Cont. (7th Ed.), 262; 8 Am. & Eng. Enc. of L. (1st Ed.), 1313.

Delivery may be made to a third person in the capacity of trustee of the donee. 66 Ark. 301; 59 Ark. 194; 60 Ark. 172; 32 Md. 87; 43 Conn. 518; 43 Ark. 320. See also 75 N. Y. 134; 95 N. Y. 206; 123 Ill. 621. Acceptance of donee is presumed. 52 N. H. 238; 30 Cal. 123.

The nature of the religious work in this case precludes the idea of a return of any money or property invested in it, and this order with all others is protected by our fundamental law. Art. 2, § 24, Const. 1874.

2. Appellee is barred. The gift was made and accepted in June, 1901, and no suit instituted until December, 1905. 66 Ark. 452.

3. No trust relation is proved. It is shown that appellee had five years in which to learn the principles, customs and regulations of the work, previous to his coming into it, and in accordance therewith delivered his property and went into the home voluntarily. In addition, that he made no claim to the property whatever until four and a half years thereafter. 26 Ark. 250; 42 Ark. 511; 50 Ark. 71.

*Geo. W. Barham*, for appellee.

1. There was no absolute gift, but a conditional surrender of property for the common benefit, the condition being that the donor should have a home; and when appellant violated the condition of the donation, he forfeited all rights, if any he had, to the property. It then became a trust fund in his hands, for which he was liable. 10 Am. & Eng. Enc. of L. (1st Ed.), 2; *Id.* 4 and note 2; *Id.* 4 and note 3; Bispham, Eq. (4th Ed.), 118; Pomeroy's Eq. 136; Bouvier's Law Dict., tit. Trust; *Id.* tit. Constructive Trust; Burrill's Law Dict., tit. Implied Trust; 21 Ark. 639; 26 Ark. 240; Perry on Trusts (3d Ed.), 166; Wharton's Law Lex., tit. Constructive Trust.

2. Appellant cannot be permitted to retain possession of this property, because of the fiduciary and confidential relations established between the parties, and the influence he had with them by reason of fraudulent representations. *Vide* Mrs. Powell's testimony. 8 Am. & Eng. Enc. of L. (1st Ed.), 646; *Id.* 647; *Id.* 650; 94 N. C. 581; 33 Ark. 425; 55 L. R. A. 60; 6 Enc. of Ev. 242; *Id.* 220; 132 Cal. 49.

3. The chancellor's findings, though not conclusive, will

not be disturbed unless clearly against the preponderance of the evidence.   71 Ark. 605; 68 Ark. 314; 72 Ark. 67; 73 Ark. 489; 67 Ark. 200; 75 Ark. 52.

HILL, C. J., (after stating the facts.)   It may be well to say, on the threshold of the consideration of the evidence, that if the testimony of Mrs. Powell prevailed, the gifts of money and property to Williams would be set aside.   If her version of the reason why she gave property obtained as to Johnston, then the case would be ruled by those where similar gifts to spiritualistic mediums, etc., are held void.   See authorities cited in note 14 Am. & Eng. Enc. of Law, 1013.   But the testimony of Mrs. Powell has no support—not even by Johnston himself.   The weight of the testimony—in fact, all the testimony except that of Mrs. Powell—is that the gifts were free and absolute gifts to the head of a peculiar religious faith. Whether the gift carried with it a home for Johnston is a matter of some doubt in the evidence; but that it was an absolute gift there can be no doubt.

Whether Williams held the property thus acquired by gift as his own absolutely, or whether he received it in trust, is a question not important in this suit.   If he received it in trust, the evidence is convincing that it was a trust for the benefit of those believing in his faith—a gift to all of them, and not a gift to be returned to the individual donors under any circumstances.

It might be well to call to mind the elemental principles which control here.   To constitute a valid gift, there must be actual delivery of the property.   *Hynson* v. *Terry,* 1 Ark. 83; *Danley* v. *Rector,* 10 Ark. 211; *Nolen* v. *Harden,* 43 Ark. 307.

When a gift is perfected by delivery, then it becomes irrevocable.   Thornton on Gifts, § 105; 2 Schouler on Personal Property, 103; *Ryburn* v. *Pryor,* 14 Ark. 505; *Nolen* v. *Harden,* 43 Ark. 307; *Williams* v. *Smith,* 66 Ark. 299.

In a recent compilation it is thus stated: "Where a gift *inter vivos* has been perfected, that is, where nothing more is to be done to vest the title in the donee, such gift can no more be revoked by the donor than a sale or any other executed contract."   20 Cyc. 1212.

The same rule prevails where the gift is for the benefit of third persons or an institution.   Thornton on Gifts, etc., 110.

The application of these settled principles to the facts in hand shows that the gifts in question was consummated by the delivery to Williams, and the evidence is convincing that the gifts and the delivery thereof were made with a full understanding and recognition of the nature and terms of the gift.

After the gifts had been perfected, Johnston continued in the faith for four years and a half, apparently satisfied with the conduct of the home and the treatment he received. But there came a change "o'er the spirit of his dreams." Whether that change was due to religious differences solely or was induced by Redding, who seemed to be playing the Voliva to Williams's Dowie in this sect, or whether it was induced by a preference for Mrs. Powell, causing the inhibition against contracting tender ties to become galling, is a matter left to speculation. That he did become dissatisfied is certain. All the witnesses, including Mrs. Powell, say that his disagreement with Mr. Williams grew out of religious differences. And Mr. Williams claimed that, under the peculiar rules of this faith, he was justified in excluding Johnston from the home on account of this religious difference. But the court does not care to go into that question, because it is not before it.

The only question here is as to the right to recover personal property under the facts set out in the statement; and, as seen, that can not be done without violating the elemental principles governing gifts of personal property by a donor of sane mind.

The case of *Ellis* v. *Newbrough,* 6 New Mex. 181, also reported in 27 Pac. 490, contains all the unique elements of this case, and more, and may be consulted with profit by anyone interested in a peculiar sect.

Judgment is reversed, and cause dismissed.